UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -- -- X
AIG FINANCIAL PRODUCTS CORP.,    :
                Plaintiff,    :
                      :  09 Civ. 6795 (LMM)
v.                    :  <u>MEMORANDUM AND ORDER</u>
                      :
PUBLIC UTILITY DISTRICT NO. 1 OF  :
SNOHOMISH COUNTY, WASHINGTON,    :
                      :
                Defendant.    :
                      :
- - - - - - - - - - - - - - - - - X

McKENNA, D.J.

      The present litigation was brought by AIG Financial
Products Corporation ("AIG-FP" or "plaintiff") against
Public Utility District No. 1 of Snohomish County,
Washington (the "District" or "defendant") alleging breach
of contract and seeking declaratory relief.[1]  The District
has moved this Court to dismiss for lack of personal
jurisdiction and improper venue, or in the alternative, to
transfer this action to the United States District Court
for the Western District of Washington pursuant to
28 U.S.C. § 1404(a).  For the reasons stated below, the
motion to dismiss is denied and the motion to transfer is
granted.

---

[1] In its complaint, AIG-FP also sought declaratory relief against
Citigroup Global Markets Inc. ("Citigroup").  However, on September 29,
2009, the Court approved AIG-FP's voluntary dismissal without prejudice
of Citigroup from this action, pursuant to Fed. R. Civ. P. 41(a)(1).
(<u>See</u> Docket, Doc. No. 27.)

## I. BACKGROUND

**A.   *The Parties***

AIG-FP is a corporation organized under the laws of Delaware, with its principal place of business in Wilton, Connecticut.  (Compl. ¶ 17.)  AIG-FP is a subsidiary of American International Group, Inc. ("AIG").  As of 2007, AIG had assets of approximately $1 trillion, $110 billion in annual revenues, 74 million customers and 116,000 employees in 130 countries and jurisdictions.  (Def. Mem. at 4.)  Created in 1987, AIG-FP has engaged in a wide variety of financial transactions for a global client base. (Id.)

The District is a municipal corporation in the State of Washington, formed to provide electric and water utility services to an area that consists of 2,200 square miles in the State of Washington.  (Compl. ¶¶ 18, 28; Def. Mem. at 6.)  The District's headquarters and all of its other offices are located in Snohomish County, Washington.  (Def. Mem. at 5.)  The District was formed by a majority vote of the people of Snohomish County, Washington, under the authority of Title 54 of the Revised Code of Washington. (Id. at 5-6.)  The District is governed by a Board of Commissioners (the "Board"), which is comprised of three local Washington State citizens, elected on a nonpartisan

basis by the people of Snohomish County and Camano Island, Washington.  (Id. at 6.)  The Board establishes policies for the District, sets rates, adopts system plans for electric and water utilities, and approves revenue obligations (such as bonds).  (Id.)

**B.   *The 1995 Bonds***

On or about February 17, 1995, the District adopted Resolution No. 4251 (the "Fourth Supplemental Resolution") for the issuance and sale of Adjustable Tender Generation System Revenue Bonds, Series 1995 (the "1995 Bonds" or the "Bonds").  (Compl. ¶ 29.)  Pursuant to the Fourth Supplemental Resolution, the District issued the 1995 Bonds in the principal amount of $58,260,000 for the purpose of financing the construction or improvement of certain electric facilities.  (Id.)  The 1995 Bonds are variable rate demand obligations and pay a variable rate of interest that is reset weekly by Citigroup, the remarketing agent, pursuant to a February 1, 1995 remarketing agreement (the "Remarketing Agreement").[2]  (Id. ¶¶ 25, 30.)  In addition,

---

[2] The Remarketing Agreement was initially entered into between the District and Smith Barney Inc. ("SB").  (Decl. of Jonathan Pickhardt, dated Aug. 31, 2009 ("Pickhardt Decl.") Ex. E at 1.)  However, Citigroup became SB's successor by merger, and thus replaced SB as the remarketing agent under the terms of the Remarketing Agreement. (Pl. Mem. at 4; see also Decl. of Christian Toft, dated Aug. 31, 2009 ("Toft Decl.") ¶ 6.)

to provide credit enhancement for the interest and principal payments due on the 1995 Bonds, the District entered into a bond insurance policy (the "MBIA Bond Insurance Policy") pursuant to which the bond insurer, Municipal Bond Investors Assurance Corporation ("MBIA"), insured the District's obligation to make the principal and interest repayments due on the 1995 Bonds.  (Id. ¶ 30.)

**C.   *The Swap Agreement***

The District also sought to manage its exposure to the variable interest rate associated with the 1995 Bonds by entering into an interest rate swap agreement with AIG-FP on December 1, 1994 (the "Swap Agreement").  (Id. ¶ 32.) Under the Swap Agreement, the District agreed to pay to AIG-FP a constant rate of 6.2% interest in return for payment by AIG-FP to the District of the variable interest rate on the Bonds.  (Id.)

During the first thirteen years of the Swap Agreement, from 1995 through mid-June 2008, the variable interest rate on the 1995 Bonds was below 6.2%.  (Decl. of James L. Herrling, dated Aug. 7, 2009 ("Herrling Decl.") ¶ 16.) Starting in mid-June 2008, the market changed and the variable interest rate on the Bonds rose above 6.2%.  (Id.) As a result, AIG-FP was obligated to pay the District the

difference between the 6.2% fixed rate and the variable interest rate.  (Id.)  One of the terms of the Swap Agreement provides that the actual weekly interest rate paid on the 1995 Bonds would switch to an Alternative Floating Rate (the "AFR") upon the occurrence of certain triggering events.  (Herrling Decl. Ex. 1 at 27, § 2.11.) Significantly for this case, the AFR is triggered by a liquidity put.  (Id.)  A liquidity put occurs when a bondholder tenders its 1995 Bonds for repurchase and a demand for payment is made to the liquidity provider because there is no open market buyer available.  (Compl. ¶ 34.)  Thus, in the event that a liquidity put triggers a switch to the AFR, the interest rate that AIG-FP is obligated to pay to the District drops from the actual rate to the significantly lower market index rate.  (Compl. Ex. A at 2-5.)

In the fall of 2008, given the impact of the expanding credit crisis and deteriorating financial climate on the interest rate for the 1995 Bonds, AIG-FP and the District entered into discussions regarding a potential termination of the Swap Agreement.  (Compl. ¶ 42.)  Those discussions failed, however, as a result of a disagreement over the proper valuation of the Swap Agreement.  (Id.)  AIG-FP calculated the value of the Swap Agreement at approximately

$17 million in its favor, while the District insisted it be valued at approximately $3 million in the District's favor. (Id.)

D.   ***The Trust Plan***

In September 2008, also in light of the deteriorating financial climate and, in turn, the high risk of a liquidity put, the District convened a meeting of the Board (the "Board Meeting").  (Id. ¶ 43.)  During this meeting, the Board considered and adopted a resolution authorizing the execution of a Trust Agreement by the District, pursuant to which a trust would be created and the District would deposit available funds in an amount sufficient to purchase all or a portion of its outstanding 1995 Bonds (the "Trust Plan"). (Id. ¶¶ 43, 45-47.)  Subsequent to the Board Meeting, the District implemented the Trust Plan and issued a notice (the "Mandatory Tender Notice") that the Bonds would be subject to mandatory tender for purchase and remarketing.  (Id. ¶ 48; Pickhardt Decl. Ex. K.)  In essence, the District set up a trust to purchase and hold the 1995 Bonds, with the goal of avoiding a liquidity put that would trigger a switch to the AFR.  (Compl. Ex. A at 3, 7-8.)

**E.  *AIG-FP's Claims Against the District***

   **1. *Implementation of the Trust Plan***

   AIG-FP alleges that the District breached the Swap
Agreement through its implementation of the Trust Plan.
(Compl. ¶¶ 12, 63-65.)  Specifically, according to AIG-FP,
the District's "repurchase of the 1995 Bonds and its
placement of those Bonds in a trust structure contravened
specific covenants under the Swap Agreement that expressly
prohibited [the District] from 'enter[ing] into any . . .
agreement for the . . . purchase of Bonds, without the
prior written consent of AIG-FP.'"  (Id. ¶ 12 (quoting
Herrling Decl. Ex. 1 at 46, § 6.2(d)(iii)).)  Furthermore,
as explained below, AIG-FP alleges that the District's
"repurchase of the 1995 Bonds reflected an overt and
deliberate attempt to contravene the intent of the parties
under the Swap Agreement and thus also violated the implied
covenant of good faith and fair dealing."  (Id. ¶ 13; see
also id. ¶ 69.)


   **2. *Improper Pressuring of Citigroup to Set Higher Rates***

   AIG-FP also claims that the District breached its
obligation to cooperate with AIG-FP to maintain the lowest
possible interest rate on the 1995 Bonds.  (Id. ¶¶ 14, 67.)
AIG-FP alleges that the District "agreed 'upon the request

of AIG-FP to cooperate with AIG-FP and take such action as
is permitted by law (including consultation with AIG-FP,
the Remarketing Agent or others) as AIG-FP shall reasonably
request . . . in order to achieve or maintain the lowest
interest rates on the Bonds'". (Id. ¶ 66 (quoting Herrling
Decl. Ex. 1 at 26-27, § 2.9(c)).)  According to AIG-FP,
"since [the District] repurchased the bonds in October 2008
it has actively embarked on a campaign to manipulate the
interest rate payable on the 1995 Bonds in order to further
maximize its returns as the now-sole bondholder." (Id. ¶
14.)  For example, AIG-FP alleges that "soon after
purchasing the bonds, [the District] proceeded to pressure
Citigroup, the remarketing agent responsible for
independently determining the weekly interest rate payable
on the bonds, to set a higher rate." (Id.; see also id. ¶
67(a).)  According to AIG-FP, the District "insisted that
Citigroup ignore a bona fide bid by AIG-FP to purchase the
bonds in setting the weekly rate, and . . . threatened
Citigroup with legal action for fraud, among other things,
if Citigroup failed to accede to [the District's] demands."
(Id. ¶ 14.)

### 3. *Failure to Terminate the Bond Insurance Policy*

In addition, AIG-FP alleges that the District breached its obligation to cooperate with AIG-FP to maintain the lowest possible interest rate when, following a downgrade in MBIA's credit rating, the District refused to comply with AIG-FP's request to terminate the MBIA Bond Insurance Policy.  (Id. ¶¶ 15, 67(e).)  According to AIG-FP, this was a reasonable request because, inter alia, it "was predicated on empirical evidence that municipal bonds trade at decreased interest rate levels when decoupled from bond insurance policies issued by distressed insurers, such as MBIA."  (Id. ¶ 15; see also id. ¶¶ 56-57.)


### 4. *Inflation of the Interest Rates by Other Means*

AIG-FP also asserts that the District further breached its obligation to cooperate with AIG-FP to maintain the lowest interest rate by "failing to cancel the repurchased 1995 Bonds"[3] and by "refusing to sell the 1995 Bonds other

---

[3] In addition, AIG-FP alleges that the District breached Section 6.2(b)(vii) of the Swap Agreement by repurchasing the 1995 Bonds and failing to deliver the 1995 Bonds to the Bond Registrar for cancellation.  (Compl. ¶¶ 71-72.)  This is because AIG-FP claims that, under the terms of the Swap Agreement, the District "agreed to 'comply with all covenants of the Issuer [i.e. Snohomish PUD] under the [Fourth Supplemental Resolution] . . . which materially affect AIG-FP to the same extent as if such covenants were set forth in full herein and all such covenants are hereby incorporated herein.'"  (Id. ¶ 71 (first and third alterations in original)(quoting Herrling Decl. Ex. 1 at 44, § 6.2(b)(vii)).)  According to AIG-FP, "Section 3.04 of the Resolution provides that 'All 1995 Bonds purchased by the District, or redeemed or exchanged shall be delivered to the Bond Registrar for cancellation.'"  (Id.)

than in accordance with a proposed purchase agreement, which imposes . . . substantial restrictions on the liquidity . . . of the 1995 Bonds."  (Id. ¶ 67.)

### 5. *Breach of Implied Covenant of Good Faith and Fair Dealing*

AIG-FP further contends that "the Swap Agreement includes an implied covenant that the parties will act in good faith and engage in fair dealing with respect to their obligations under the Agreement."  (Id. ¶ 68.)  AIG-FP alleges that the District breached this implied covenant of good faith and fair dealing through all of the above-mentioned actions.  (See id. ¶¶ 69-70.)

### 6. *Declaratory Relief*

AIG-FP also seeks a declaration from the Court that "all floating payments due under the Swap Agreement should automatically be deemed to be at the [AFR] for all purposes, including for the purpose of calculating future swap payments or for valuing the Swap Agreement in order to calculate any termination payments due between the parties."  (Id. ¶ 79.)  Furthermore, with respect to the Remarketing Agreement, AIG-FP seeks a declaration that "Citigroup, as remarketing agent, should consider AIG-FP's

bona fide bid to purchase all the outstanding 1995 Bonds in
setting the weekly interest rate pursuant to the terms of
the Remarketing Agreement."  (Id. ¶ 87.)

## F.  *The Parties' Competing Lawsuits*

On July 2, 2009, AIG-FP brought suit against the
District and Citigroup for, inter alia, breach of the Swap
Agreement.  On July 31, 2009, the District and Citigroup
removed the action to this Court.  On July 30, 2009, the
District brought a parallel suit in the United States
District Court for the Western District of Washington,
asserting claims for declaratory and injunctive relief
against AIG-FP.  (Decl. of Jayant W. Tambe, dated Aug. 7,
2009 ("Tambe Decl.") Ex. 2.)  In its Washington action, the
District seeks a declaration that it is not in breach of
the Swap Agreement (or any of the other related
agreements), that AIG-FP breached the Swap Agreement's
prompt notice provision and that, as a result of AIG-FP's
breach, AIG-FP cannot designate an Event of Default or an
Early Termination date.  (Tambe Decl. Ex. 2 ¶¶ 8, 57.)

## II. DISCUSSION

**A. *Personal Jurisdiction***

Before the Court, is the District's motion to dismiss this action for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  The plaintiff has the burden of demonstrating that the Court has jurisdiction.  Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996). However, as is the case here, "[w]here . . . a district court relies on the pleadings and affidavits, and chooses not to conduct a 'full-blown evidentiary hearing,' plaintiffs need only make a prima facie showing of personal jurisdiction over the defendant."  Porina v. Marward Shipping, 521 F.3d 122, 126 (2d Cir. 2008) (quoting DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001)).  Furthermore, for purposes of evaluating a 12(b)(2) motion, the pleadings and affidavits are to be construed in the light most favorable to the plaintiff -- here, AIG-FP -- and all doubts are to be resolved in the plaintiff's favor.  DiStefano, 286 F.3d at 84.[4]

---

[4] The District argues that the Court should disregard AIG-FP's factual assertions which are supported by no evidence or by statements of individuals lacking personal knowledge.  (Def. Mem. at 1 & n.2.)  The Court relies on the declarations submitted by AIG-FP only insofar as they reflect personal knowledge of the declarants.  See Capitol Records, Inc. v. MP3tunes, LLC, No. 07 Civ. 9931, 2008 WL 4450259, at *2 (S.D.N.Y. Sept. 29, 2008) (striking statements of individuals lacking personal knowledge based on principle that "[a]ny evidence submitted outside the pleadings on a motion to dismiss for lack of jurisdiction must be competent").

In diversity cases, the issue of personal jurisdiction is governed by the law of the forum state -- in this case, New York's Civil Practice Law and Rules ("N.Y. C.P.L.R.") sections 301 and 302 -- along with the requirements of constitutional due process.  D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 104 (2d Cir. 2006).  Thus, the Court must first determine whether a basis exists for personal jurisdiction under New York State law; and, second, it must assess whether the Court's assertion of jurisdiction comports with the requirements of due process. Metro. Life, 84 F.3d at 567.

### 1. *N.Y. C.P.L.R. § 302(a)(1)*

Under New York State law, a court may exercise personal jurisdiction over a non-domiciliary "who in person or through an agent . . . transacts any business within the state," provided that the "cause of action aris[es] from" such transaction of business.  N.Y. C.P.L.R. § 302(a)(1). Thus, a court may exercise personal jurisdiction under section 302(a)(1) if the defendant (1) "transacts any business" in New York and (2) the plaintiff's cause of action arises from such transaction of business.  Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007). For the reasons that follow, the Court finds that AIG-FP

has made a <u>prima facie</u> showing that the District transacted
business within New York State and that the claims asserted
by AIG-FP arise from the District's transaction of business
within the state.

### a. *Defendant Transacted Business in New York*

"Courts look to the totality of the defendant's
activities within the forum, to determine whether a
defendant has transacted business in such a way that it
constitutes purposeful activity satisfying the first part
of the test." <u>Id.</u> (internal quotation marks and citations
omitted).  Nonetheless, "'proof of one transaction in New
York is sufficient to invoke jurisdiction, even though the
defendant never enters New York so long as the defendant's
activities here were purposeful and there is a substantial
relationship between the transaction and the claim
asserted.'" <u>Deutsche Bank Sec., Inc. v. Mont. Bd. of
Invs.</u>, 850 N.E.2d 1140, 1142 (N.Y. 2006) (quoting <u>Kreutter
v. McFadden Oil Corp.</u>, 522 N.E.2d 40, 43 (N.Y. 1988)); <u>see
also Best Van Lines</u>, 490 F.3d at 248.  Furthermore,
"'[c]umulative minor activities that, individually, may be
insufficient, may suffice . . . as long as the cumulative
effect creates a significant presence within the state.'"
<u>Freeplay Music, Inc. v. Cox Radio, Inc.</u>, No. 04 Civ. 5238,

2005 WL 1500896, at *5 (S.D.N.Y. June 23, 2005) (second alteration in original) (quoting O'Brien v. Hackensack Univ. Med. Ctr., 760 N.Y.S.2d 425, 427 (N.Y. App. Div. 2003)).

The Second Circuit has indicated that several factors should be considered in determining whether an out-of-state defendant has transacted business in New York State, including the following: (i) whether the defendant has an ongoing contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires the defendant to send notices and payments into the forum state. Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004). All of these factors are relevant to the analysis, but no one factor is dispositive and additional factors may be considered. Id. at 23. The "'overriding criterion' necessary to establish a transaction of business is 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within [New York].'" Ehrenfeld v.

15

<u>Bin Mahfouz</u>, 881 N.E.2d 830, 834 (N.Y. 2007) (alteration in
original) (quoting <u>McKee Elec. Co. v. Rauland-Borg Corp.</u>,
229 N.E.2d 604, 607 (N.Y. 1967)).


    **(i)**   ***Ongoing Contractual Relationship with New York
Corporation***

    The first factor, whether the District has an ongoing
contractual relationship with a New York corporation, is
satisfied as a result of the Remarketing Agreement between
the District and Citibank, which is a New York corporation
with its principal place of business in New York (Compl.
¶ 19).  The Remarketing Agreement between the District and
Citigroup was dated February 1, 1995 and is still in
effect.  (Compl. ¶ 30; Pickhardt Decl. Ex. E.)  Thus, the
District had an ongoing contractual relationship with a New
York corporation.[5]  In addition, the District secured a
guarantee under the Swap Agreement from AIG, which is also
a New York-based company.  (<u>See</u> Herrling Decl. Ex. 1 at B-
A-1-3; <u>see</u> <u>also</u> <u>id.</u> at 30, § 3.1 ("It is understood and
agreed that the Issuer, in entering into this Agreement, is
and will be relying on the Guarantee, pursuant to which the
Guarantor has . . . unconditionally guaranteed the prompt

---

[5] The Swap Agreement between the District and AIG-FP is not relevant
under this factor, since AIG-FP is not a New York corporation --
rather, AIG-FP is a Delaware corporation with its principal place of
business in Connecticut.  (Compl. ¶ 17.)

payment . . . of any and all obligations of AIG-FP hereunder as provided in the Guarantee.").)  Finally, at least as of October 2008, it appears that the District had an ongoing contractual relationship with the New York Branch of DePfa Bank plc ("DePfa"), as a result of a Standby Bond Purchase Agreement between the District and DePfa, dated July 1, 2007.[6]  (Second Supp. Decl. of James L. Herrling, dated Oct. 22, 2009 ("Herrling Second Supp. Decl.") Ex. 1 at 1.)

### (ii) *Contract Negotiated or Executed in New York*

The second factor, whether the contract was negotiated or executed in New York, is also satisfied.  According to AIG-FP, "the Swap Agreement was heavily negotiated between [the District] and AIG-FP, with [the District] represented by sophisticated advisors acting in New York."  (Pl. Mem. at 3 (citing Compl. ¶ 29).)  AIG-FP states that these advisors, bankers from Lazard Frères & Company ("Lazard"), "were located in New York, and numerous telephone calls and

---

[6] The District contends that "the only agreement implicated by this suit . . . is the Swap Agreement."  (Def. Reply Mem. at 2 n.3.)  However, in its complaint against AIG-FP, the District undermines its argument that the Swap Agreement should be viewed in isolation.  (See Tambe Decl. Ex. 2 ¶ 50 ("[G]iven the highly complex and interrelated nature of the various agreements concerning the 1995 Bonds, there is a real risk of further unintended and immeasurable consequences of a termination of the Swap Agreement by AIG-FP.").)  The Court finds that AIG-FP is correct in its contention that, in addition to the Swap Agreement, AIG-FP's lawsuit implicates related resolutions and agreements.

other correspondence relating to the Swap Agreement and the Bonds, including the initial letter soliciting a bid from AIG-FP, were transmitted through Lazard's New York office." (Id. (citing Toft Decl. ¶ 8); Pickhardt Decl. Ex. B.) Lazard's role in the Swap Agreement negotiations is evidenced, in part, by a letter to AIG-FP, in which Lazard stated that "as the District's financial advisor, we have been asked to solicit interest in providing the interest rate swap component of the transaction, as well as associated [Variable Rate Demand Obligation] liquidity and/or [Variable Rate Demand Obligation] liquidity guarantees. . . . If your institution is interested in providing the swap, please provide the following . . . ." (Pickhardt Decl. Ex. B at 2.)

     Despite the District's contention that Lazard's role in the negotiation of the Swap Agreement was not significant (see e.g., Def. Reply Mem. at 2-3), one of the declarations submitted by the District in support of its motion to dismiss supports the conclusion that Lazard's involvement in the contract negotiations was essential, (see Decl. of William M. Doyle, dated Sept. 16, 2009 ("Doyle Decl.") ¶¶ 11-12).  According to the District's bond counsel, William M. Doyle, under Washington State law, the District was required to "'solicit and give due

18

consideration to proposals from at least two entities'
before entering into a 'payment agreement,' such as . . . a
swap agreement."  (Id. ¶ 11 (quoting Wash. Rev. Code §
39.96).)  The letters sent by Lazard, soliciting bids on
behalf of the District were sent to satisfy this statutory
requirement.  (Id.)  In addition, according to Doyle,
Lazard "certified that the Swap Agreement with AIG-FP was
'commercially reasonable' and likely to provide an economic
benefit to the District, if fully performed, also as
required by Chapter 39.96." (Id. ¶ 12.)  Although it may be
that some, or even most, of the material terms of the Swap
Agreement were not negotiated by Lazard, as the District
contends (see e.g., id. ¶¶ 10, 12-13), it is undisputed
that the District would not have been in compliance with
Washington State law had it entered into the Swap Agreement
in the absence of the services provided by Lazard (see id.
¶¶ 11-12; Supp. Decl. of Christian Toft, dated Oct. 7, 2009
("Toft Supp. Decl.") ¶ 3).  As noted in a supplemental
declaration submitted by AIG-FP in response to the
District's reply brief, "Mr. Doyle concedes that Lazard's
involvement on [the District's] behalf was necessary for
the Swap Agreement to comply with Washington law and thus,
even under his description, Lazard's New York office played
a critical role in connection with the execution of the

Swap Agreement because, under Washington law, [the District] could not have entered into the Swap Agreement without the services of Lazard in reviewing and analyzing its terms."  (Toft Supp. Decl. ¶ 3.)

In addition, the District's representations in one of its submissions to the U.S. District Court for the Western District of Washington, where the District's lawsuit against AIG-FP is pending, undermine its argument that Lazard did not play a significant role in the formation of the Swap Agreement.[7]  In one of its submissions, the District states that "a request by [Lazard] for a formal Swap Agreement proposal . . . resulted in AIG-FP's submission of that proposal to the District" and concedes that "[t]his and other communications to the District about the swap agreement, necessary for the District to consider and agree to it, was essential to the formation of the Swap Agreement."  (Pl. Supp. Br. at 4, Pub. Util. Dist. No. 1 of Snohomish County, Wash. v. AIG Fin. Prods., No. 2:09 Civ. 01086 (W.D. Wash. filed Aug. 24, 2009) ("Supp. Mem.").)  Thus, the Court concludes that significant pieces of the

---

[7] The Court "may take judicial notice of public records and of 'admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings.'"  Munno v. Town of Orangetown, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005) (quoting Harris v. N.Y. State Dep't of Health, 202 F. Supp. 2d 143, 173 (S.D.N.Y. 2002); see also Jackson v. Broad. Music, Inc., No. 04 Civ. 5948, 2006 WL 250524, at *7 (S.D.N.Y. Feb. 1, 2006).

Swap Agreement negotiations were conducted by New York-
based Lazard on behalf of the District out of Lazard's New
York office.[8]  Indeed, this fact alone may be sufficient to
confer jurisdiction. See Clarendon Nat'l Ins. Co. v. Lan,
152 F. Supp. 2d 506, 517 (S.D.N.Y. 2001) ("New York-based
contractual negotiations can by themselves constitute the
transaction of business in New York if they substantially
advanced or were substantively important or essential to
the formation of the contract so long as the negotiations
relate to the same agreement that is the subject of
plaintiff's lawsuit." (internal quotation marks and
citation omitted)).

---

[8] Under section 302(a)(1), jurisdiction can be established through the
actions of the defendant or the defendant's agent.  N.Y. C.P.L.R. §
302(a)(1).  The District does not appear to challenge AIG-FP's
assertion that Lazard was the District's agent for purposes of
determining whether there is personal jurisdiction under section
302(a)(1).  (Cf. Def. Reply Mem. at 5 n.8 ("AIG-FP's argument that
Lazard was the District's agent is fatuous" since "to be an agent for
Section 301 jurisdictional purposes one hundred percent of the agent's
time must be devoted to the defendants' business." (internal quotation
marks and citation omitted)).)  The Court notes that, unlike the higher
standard for establishing agency under section 301, the standard for
"determining whether an agency relationship exists for the purposes of
Section 302, . . . [is that] the alleged agent 'must have acted in the
state for the benefit of, and with the knowledge and consent of, the
non-resident principal.'"  Cavu Releasing, LLC. v. Fries, 419 F. Supp.
2d 388, 392 (S.D.N.Y. 2005) (quoting CutCo Indus. v. Naughton, 806 F.2d
361, 366 (2d Cir. 1986)).  Here, the Court finds that AIG-FP has made
sufficient allegations to establish that Lazard acted on behalf of, and
as the agent for, the District with respect to soliciting interest in
and negotiating the terms of the Swap Agreement.

**(iii)   *New York Choice-Of-Law Clause***

The third factor, whether the contract contains a New York choice-of-law clause, is also satisfied.  The Swap Agreement states, in relevant part, that "[t]his agreement shall be construed in accordance with and governed by the laws of the State of New York . . . it being understood however that the corporate powers and legal capacity of the Issuer shall be governed by and construed in accordance with the laws of the State of Washington." (Herrling Decl. Ex. 1 at 56, § 10.7 (emphasis omitted).) The District contends that this is a hybrid choice-of-law clause.  (Def. Reply Mem. at 3.)  However, it is clear from the plain language of the agreement that the parties intended for the Swap Agreement to be construed in accordance with New York State law.[9]  The Swap Agreement's New York "choice of law clause is a significant factor . . . because the parties, by so choosing, invoke[d] the benefits and protections of New York law."  Sunward, 362 F.3d at 23 (citing CutCo Indus. v. Naughton, 806 F.2d 361, 367 (2d Cir. 1986)); see also Sacody Techs., Inc. v. Avant, Inc., 862 F. Supp. 1152, 1156 (S.D.N.Y. 1994).

---

[9] The fact that the Swap Agreement's choice-of-law clause provides that Washington State law governs with respect to the corporate powers and legal capacity of the District does not affect the Court's analysis of this factor since this lawsuit does not relate to the corporate powers or legal capacity of the District.

**(iv)** *Sending of Notices and Payments into New York*

The fourth and final factor, whether the contract requires the defendant to send notices and payments into New York, is satisfied here as well.  Pursuant to the Swap Agreement, the District was required to make payments into New York.  The Swap Agreement states, in relevant part, that "[t]he Issuer will pay or cause to be paid the applicable Fixed Amount payable by it on each applicable Payment Date by transfer of such amount to Swiss Bank Corporation, New York Branch . . . ."  (Herrling Decl. Ex. 1 at 21, § 2.2(ii).)  In addition, under the Swap Agreement, the District is required to send notices into New York.  The Swap Agreement provides that, with one limited exception, "all notices hereunder required to be given by one party to another or to or by the Collateral Agent shall also be given to the Insurer at the same time as such notice is given to such party."  (Id. at 52, § 8.2.)  The Agreement lists MBIA as the Insurer and provides MBIA's New York address as the address to which all such notices "shall be delivered."  (Id. at 52-53, § 8.2.)  Furthermore, the District received payments from New York bank accounts (Toft Decl. ¶ 9), which is also relevant to the jurisdictional analysis.  See Sea Tow Servs. Int'l, Inc. v. Pontin, 472 F. Supp. 2d 349, 359

23

(E.D.N.Y. 2007) (finding receipt of payments from New York relevant to analysis).

### (v)  *Additional New York-Related Activities*

After consideration of just these four factors, the Court finds that AIG-FP has made a prima facie showing that the District transacted business in New York.  However, the Court notes that the District has engaged in additional activities which further demonstrate the District's purposeful availment of the privilege of conducting business within the state.

Significantly, some of the conduct that allegedly constitutes the breaches of the Swap Agreement either occurred in, or was directed to, New York.  For example, AIG-FP alleges that, in the process of implementing the Trust Plan -- in violation of the Swap Agreement's prohibition on the District entering into an agreement for the purchase of Bonds without AIG-FP's consent -- the District sent the Mandatory Tender Notice to three New York addressees.  (Pl. Mem. at 8 (citing Pickhardt Decl. Ex. K).)  AIG-FP also alleges that the Mandatory Tender Process, through which the District purchased the Bonds, was conducted by Citigroup's Short Term Finance Group,

which is located in New York.  (<u>Id.</u> (citing Toft Decl. ¶ 6).)

Furthermore, the District's alleged breach of its obligation to cooperate with AIG-FP to maintain the lowest possible interest rate on the 1995 Bonds consisted, in part, of communications directed to New York entities. AIG-FP alleges that, in a March 11, 2009 letter, which was addressed to Citigroup's New York office, the District improperly pressured Citigroup to reset the interest rate of the 1995 Bonds at a higher level.  (<u>Id.</u> at 9 (citing Pickhardt Decl. Ex. J).)  In addition, the District refused AIG-FP's request to terminate the MBIA Bond Insurance Policy in a letter dated October 8, 2008, which included New York-based MBIA as an addressee.  (Pickhardt Decl. Ex. M.)

In light of the foregoing, the Court finds that AIG-FP has made a <u>prima</u> <u>facie</u> showing that the District transacted business in New York State.

### b. *Plaintiff's Suit Arises from Defendant's Transaction of Business in New York*

The second part of the Court's jurisdictional analysis under section 302(a)(1) requires that the plaintiff's cause of action arise from the defendant's transaction of

business in New York.  Best Van Lines, 490 F.3d at 246.  A

cause of action arises from the defendant's activities in

the state "'if there is an articulable nexus, or a

substantial relationship, between the claim asserted and

the actions that occurred in New York.'"  Id. (quoting

Henderson v. INS, 157 F.3d 106, 123 (2d Cir. 1998)).

     Here, the Court finds that there is both an

"articulable nexus" and a "substantial relationship"

between AIG-FP's declaratory judgment and breach of

contract claims and the District's alleged transactions of

business in New York.  A breach of contract claim arises

from facts related to the formation, performance, or breach

of a contract.  Barrett v. Tema Dev. (1988), Inc., 463

F. Supp. 2d 423, 430-31 (S.D.N.Y. 2006) (citing Agency Rent

A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 31

(2d Cir. 1996)); see also Sea Tow, 472 F. Supp. 2d at 360.

As discussed above, the District's transaction of business

in New York consisted of activities relating to the

formation, performance and alleged breach of the Swap

Agreement; therefore, the Court finds that AIG-FP's cause

of action for breach of contract and declaratory judgment,

with respect to the Swap Agreement, arose, in part, from

the District's transaction of business in New York.  First,

solicitation for and negotiations regarding the Swap

Agreement, which the District is alleged to have breached, were conducted by the District's agent and financial advisor, Lazard, out of its New York office.  Second, payments were made into and received from New York.  See Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank, 774 N.E.2d 696, 701 (N.Y. 2002) (finding that New York is "the place of performance because the affected party is to be paid through [New York bank]").  Third, at least some of the alleged breaches of the Swap Agreement occurred in New York or as a result of activities directed into the state.

The Court also finds that AIG-FP's cause of action for declaratory judgment, with respect to the Remarketing Agreement between the District and Citigroup, arose from the District's transaction of business in New York.  Since the interpretation and construction of the Remarketing Agreement is the subject of AIG-FP's request for declaratory judgment (see Compl. ¶ 87), it is clear that the District's formation of the Remarketing Agreement, and ongoing contractual relationship with Citibank thereunder, has both an "articulable nexus" and a "substantial relationship" with the claim asserted by AIG-FP.

Thus, the Court finds that the connection between AIG-FP's contract claims and the District's transaction of

business in New York is sufficient to support jurisdiction over the District under section 302(a)(1).

### 2. *N.Y. C.P.L.R. § 301*

Because the Court finds that personal jurisdiction under section 302(a)(1) is appropriate, it does not reach the question of whether the Court has personal jurisdiction under N.Y. C.P.L.R. § 301.

### 3. *Due Process*

The Court must also determine whether its assertion of jurisdiction over the District comports with the requirements of due process since the exercise of long arm jurisdiction must satisfy constitutional due process standards. Sunward, 362 F.3d at 24. Here, AIG-FP has made a prima facie showing that due process is satisfied.

An exercise of jurisdiction violates due process unless the defendant has minimum contacts with the forum state such that the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted). The "minimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege

of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Asahi Metal Indus. v. Superior Court, 480 U.S. 102, 109 (1987) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).  For the reasons discussed above, the Court finds that through its New York-related activities the District purposefully availed itself of the privilege of conducting activities in New York State, such that this Court's exercise of jurisdiction comports with traditional notions of fair play and substantial justice.  Consequently, the Court finds that there is jurisdiction over the District under New York State law and that the Court's exercise of such jurisdiction is consistent with the standards of constitutional due process.

**B.   *Venue***

The District also moves to dismiss for improper venue pursuant to Fed. R. Civ. P. 12(b)(3).  "In analyzing whether the plaintiff has made the requisite prima facie showing that venue is proper, [the Court] view[s] all the facts in a light most favorable to plaintiff." Phillips v. Audio Active Ltd., 494 F.3d 378, 384 (2d Cir. 2007). Although plaintiff benefits from this construction, once an objection has been made, plaintiff nonetheless bears the

burden of showing that venue is proper.  Imagineering, Inc.
v. Lukingbeal, No. 94 Civ. 2589, 1996 WL 148431, at *2
(S.D.N.Y. Apr., 2 1996) (citing PI, Inc. v. Quality Prods.,
907 F. Supp. 752, 757 (S.D.N.Y. 1995)).

     The District contends that venue is improper in the
State of New York because the chosen forum does not meet
the requirements of 28 U.S.C. § 1391(a).  (Def. Mem.
at 21.)  However, as AIG-FP points out, 28 U.S.C. § 1391(a)
does not apply to cases, like this one, which are removed
from state court to federal court.  (Pl. Mem. at 21.)
Although the District is correct that venue in diversity
cases is generally governed by 28 U.S.C. § 1391(a),
28 U.S.C. § 1441(a) controls in actions which have been
removed from state court.  Palace Exploration Co. v.
Petroleum Dev. Co., 41 F. Supp. 2d 427, 437 (S.D.N.Y. 1998)
(citing Polizzi v. Cowles Magazines, Inc., 345 U.S. 663,
665 (1953)); see also PT United Can Co. v. Crown Cork &
Seal Co., 138 F.3d 65, 72 (2d Cir. 1998) ("[T]he removal
statute, and not the ordinary federal venue statute,
governs venue in removed cases." (citation omitted)).
Under 28 U.S.C. § 1441(a), venue of the removed case is
"the district and division embracing the place where such
action is pending."  Since this case was removed from New
York State court to this Court, venue is proper in this

district and the District's motion to dismiss for improper venue is denied.[10]

## C.  *Motion to Transfer*

The Court next considers the District's motion to transfer this action to the Western District of Washington pursuant to 28 U.S.C. § 1404(a).  According to § 1404(a), "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  Motions to transfer lie within the district court's broad discretion, and "are determined upon notions of convenience and fairness on a case-by-case basis."  In re Cuyahoga Equip. Corp., 980 F.2d 110, 117 (2d Cir. 1992).  The District "bears the burden of making a 'clear-cut showing that [transfer] is warranted,' and that 'the balance of convenience weighs clearly in [its] favor.'"  Elbex Video, Ltd. v. Tecton, Ltd., No. 00 Civ. 0673, 2000 WL 1708189, at *4 (S.D.N.Y. Nov. 15, 2000)

---

[10] It is worth noting that "[a] party who removes an action from state to federal court does not, in so doing, waive the defense of improper venue as to the underlying state court action." (PT United, 138 F.3d at 72 (citing Moss v. Atl. Coast Line R.R., 157 F.2d 1005, 1006 (2d Cir. 1946)).  However, the Court does not address this issue since the District does not contend that venue was improper in the underlying state court action.

(quoting Nieves v. Am. Airlines, 700 F. Supp. 769, 772 (S.D.N.Y. 1988)) (alterations in original).

As part of its analysis, the Court also considers the timing of this lawsuit vis-à-vis the lawsuit filed by the District against AIG-FP which is currently pending in the United States District Court for the Western District of Washington.  AIG-FP argues that "[a]s the first-filed action, this lawsuit is entitled to the presumption that it not be transferred in favor of a later-filed action." (Pl. Mem. at 22 (footnote omitted).)  As a general rule, where there are two competing lawsuits, the first suit should have priority absent special circumstances or where the balance of convenience favors the second-filed action. Employers Ins. of Wausau v. Fox Entm't Group, 522 F.3d 271, 274-75 (2d Cir. 2008).  Examples of circumstances that justify an exception to the rule are "when the first suit constitutes an 'improper anticipatory filing' or was motivated solely by forum shopping." Citigroup Inc. v. City Holding Co., 97 F. Supp. 2d 549, 556 (S.D.N.Y. 2000) (quoting Toy Biz, Inc. v. Centuri Corp., 990 F. Supp. 328, 332 (S.D.N.Y. 1998)).

As a threshold matter, the Court must determine whether the action could have been brought in the proposed transferee district.  28 U.S.C. § 1404(a); Atl. Recording

Corp. v. Project Playlist, Inc., 603 F. Supp. 2d 690, 695
(S.D.N.Y. 2009) ("The threshold question in deciding
transfer of venue is whether the action could have been
brought in the transferee forum." (internal quotation marks
and citation omitted)).  Neither party disputes that this
action could have been brought in the United States
District Court for the Western District of Washington.
Venue in that court would be proper under 28 U.S.C.
§ 1391(a), which states that a civil action founded solely
on diversity may be brought in "a judicial district where
any defendant resides, if all defendants reside in the same
State."  Here, since the District resides in the State of
Washington, this action could have been brought in the
Western District of Washington.


    1. *Balance of Convenience*

    The factors relevant to the analysis of the balance of
convenience exception to the first-filed rule are
essentially the same as those considered in connection with
motions to transfer venue pursuant to 28 U.S.C. § 1404(a).
Wausau, 522 F.3d at 275.  Because the factors to be
considered by the Court are substantially identical, a
single analysis of the factors will resolve both issues.
See, e.g., Everest Capital Ltd. v. Everest Funds Mgmt.,

178 F. Supp. 2d 459, 465 (S.D.N.Y. 2002).  Here, for the
reasons explained below, the Court finds that the balance
of convenience supports departure from the first-filed rule
and justifies transfer of venue.

In determining the balance of convenience, the
following factors are relevant:  (a) the plaintiff's choice
of forum, (b) the convenience of witnesses, (c) the
location of relevant documents and relative ease of access
to sources of proof, (d) the convenience of the parties,
(e) the locus of operative facts, (f) the availability of
process to compel the attendance of unwilling witnesses,
(g) the relative means of the parties, (h) the forum's
familiarity with the governing law, and (i) trial
efficiency and the interest of justice, based on the
totality of the circumstances.  D.H. Blair, 462 F.3d at
106-07; Walker v. Jon Renau Collection, Inc., 423 F. Supp.
2d 115, 117 (S.D.N.Y. 2005).  While all of these factors
are relevant to the analysis, "[t]he core determination to
be made under section 1404(a) involves identifying the
center of gravity of the litigation; a key component of
that inquiry is focused upon the convenience of witnesses."
Myers v. Doe, No. 9:04 Civ. 0270, 2006 WL 3392692, at *2
(N.D.N.Y. Nov. 22, 2006) (citing Viacom Int'l, Inc. v.

<u>Melvin Simon Prods.</u>, 774 F. Supp. 858, 868 (S.D.N.Y. 1991)).

### a. *Plaintiff's Choice of Forum*

"The Second Circuit has consistently held that 'a plaintiff's choice of forum is presumptively entitled to substantial deference.'" <u>Atl. Recording</u>, 603 F. Supp. 2d at 698 (quoting <u>Gross v. BBC</u>, 386 F.3d 224, 230 (2d Cir. 2004)). However, that deference is reduced where, as here, the plaintiff's choice of forum is not its principal place of business. <u>Intema Ltd. v. NTD Labs.</u>, No. 09 Civ. 0633, 2009 WL 2958432, at *7 (E.D.N.Y. Sept. 12, 2009) (citing <u>Williams Advanced Materials, Inc. v. Target Tech. Co.</u>, No. 03 Civ. 276, 2007 WL 2245886, at *6 (W.D.N.Y. Aug. 1, 2007)); <u>see also</u> <u>Wausau v. News Corp.</u>, No. 06 Civ. 1602, 2008 WL 4443899, at *3 (S.D.N.Y. Sept. 29, 2008) ("[W]here the plaintiff has chosen a forum that is neither the district of its residence, nor the locus of the operative facts in the case, this choice is given considerably less weight."). Here, as noted above, plaintiff AIG-FP is neither incorporated in New York nor does it have its principal places of business in New York. (<u>See</u> Compl. ¶ 17.) Furthermore, as explained below, the Court finds that the Southern District of New York is not the locus of

operative facts.  Thus, AIG-FP's choice of forum is entitled to little deference in this case.

   b. *Convenience of Witnesses*

     The convenience of witnesses is typically regarded by courts as the most important factor in considering a motion to transfer pursuant to § 1404(a).  See, e.g., Atl. Recording, 603 F. Supp. 2d at 695; Eres N.V. v. Citgo Asphalt Ref. Co., 605 F. Supp. 2d 473, 480 (S.D.N.Y. 2009); Capitol Records, LLC v. VideoEgg, Inc., 611 F. Supp. 2d 349, 366 (S.D.N.Y. 2009).  Generally, the "'convenience of non-party witnesses is accorded more weight than that of party witnesses.'" ESPN, Inc. v. Quiksilver, Inc., 581 F. Supp. 2d 542, 547 (S.D.N.Y. 2008) (quoting Indian Harbor Ins. Co. v. Factory Mut. Ins. Co., 419 F. Supp. 2d 395, 402 (S.D.N.Y. 2005)).  In assessing this factor, "a court does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum." Herbert Ltd. v. Elec. Arts Inc., 325 F. Supp. 2d 282, 286 (S.D.N.Y. 2004). Rather, "the court must qualitatively evaluate the materiality of the testimony that the witnesses may provide." Id.  A party that seeks transfer on account of the convenience of witnesses "must clearly specify the key witnesses to be

called and must make a general statement of what their testimony will cover." Walker, 423 F. Supp. 2d at 117 (citing Factors Etc. v. Pro Arts, Inc., 579 F.2d 215, 218 (1978), overruled on other grounds by Pirone v. MacMillan, Inc., 894 F.2d 579 (2d Cir. 1990)).

Here, the District has demonstrated that the convenience of witnesses and, in particular, non-party witnesses, favors transfer to the Western District of Washington. The District has identified by name a number of probable non-party witnesses who will be inconvenienced, as well as the substance of what their testimony will cover. (See Supp. Decl. of James L. Herrling, dated Sept. 16, 2009 ("Herrling Supp. Decl.") ¶ 14.) In contrast, AIG-FP has only provided vague and general statements regarding its potential witnesses. For example, AIG-FP states, in its opposition to the District's motion, that the District "cannot rebut that many witnesses (such as Lazard and Citigroup employees) . . . likely are located in New York, and that New York is more convenient than Washington for Connecticut witnesses." (Pl. Mem. at 23.) Similarly, AIG-FP submitted an affidavit which stated that "[t]here are an equal or greater number of potential witnesses in this action who reside in the New York metropolitan area – including employees and former

employees of AIG, AIG-FP, Citigroup, and Lazard – for whom testimony in Washington would be an equal inconvenience." (Toft Supp. Decl. ¶ 19.)  The District's preliminary list of witnesses includes a number of current and former District employees and advisors, located in Washington and California, who participated in planning and carrying out the activities which allegedly constituted breaches of the Swap Agreement, and who are likely to be key witnesses in adjudicating this lawsuit on the merits.  (See Herrling Supp. Decl. ¶ 14.)  Although employees of AIG-FP, AIG, Citigroup and Lazard are likely to provide relevant testimony, AIG-FP has failed to provide their names or the substance of the testimony they would provide.[11]  Thus, the Court finds that the convenience of the witnesses weighs in favor of transfer.

### c. *Location of Relevant Documents*

"The location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents."  Am. S.S. Owners Mut. Prot. & Indem.

---

[11] AIG-FP does specifically allege that the District's substantive arguments will likely implicate the testimony of AIG-FP's New York advisors.  (Pl. Mem. at 23-24 & n.34.)  Again, however, AIG-FP does not identify any of these potential witnesses by name.  The inconvenience of travel from New York to Washington for a few unidentified witnesses, whom AIG-FP alleges would provide testimony regarding an issue that is not central to this lawsuit, is not sufficient to shift the balance of convenience of the witnesses in favor of New York.

Ass'n v. LaFarge N. Am., Inc., 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007) (citing Aerotel Ltd. v. Sprint Corp., 100 F. Supp. 2d 189, 197 (S.D.N.Y. 2000)). The District has not indicated any special circumstances that would cause this factor to weigh in its favor. Accordingly, this factor is neutral.

### d. *Convenience of the Parties*

"The parties' convenience becomes a neutral factor in the transfer analysis if transferring venue would merely shift the inconvenience to the other party." Beatie & Osborn LLP v. Patriot Scientific Corp., 431 F. Supp. 2d 367, 396 (S.D.N.Y. 2006) (internal quotation marks and citation omitted); see also Federman Assocs. v. Paradigm Med. Indus., No. 96 Civ. 8545, 1997 WL 811539, *3 (S.D.N.Y. Apr. 8, 1997) (This factor "weighs neutrally" where "[r]egardless of the forum in which the action takes place, one party will be obligated to travel."). The District argues that it would be inconvenienced should the action remain in the Southern District of New York (Herrling Supp. Decl. ¶ 13); but AIG-FP would also be inconvenienced should the action be transferred to the Western District of Washington since AIG-FP is a Delaware corporation, with its principal place of business in the State of Connecticut

(Compl. ¶ 17).  Because transferring venue would only shift the inconvenience from one party to the other, this factor is neutral.

### e. *Locus of Operative Facts*

"In determining the locus of operative facts, courts look to the 'site of the events from which the claim arises.'"  Oubre v. Clinical Supplies Mgmt., No. 05 Civ. 2062, 2005 WL 3077654, at *4 (S.D.N.Y. Nov. 17, 2005) (quoting 800-Flowers, Inc. v. Intercontinental Florist, Inc., 860 F. Supp. 128, 134 (S.D.N.Y. 1994)).  A breach of contract claim arises from facts related to the formation, performance, or breach of a contract.  Barrett, 463 F. Supp. 2d at 430-31 (citing Agency Rent A Car, 98 F.3d at 31); see also Sea Tow, 472 F. Supp. 2d at 360.  For purposes of its personal jurisdiction analysis, the Court concluded that AIG-FP's claims arose in part from activities in, or directed to, New York State; nonetheless, the Court finds that the locus of operative facts is Washington, not New York.

The present record establishes that the formation of the Swap Agreement and the Remarketing Agreement involved contacts with Washington and New York.  In addition, AIG-FP's and the District's performance under the Swap

Agreement occurred in both Washington and New York.  (See, e.g., Toft Decl. ¶ 9 (The District "has both made payments into and received payments from AIG-FP's New York bank accounts."); Supp. Mem. at 2 ("AIG-FP has over the past 14 years: (i) regularly provided notifications to the District of weekly interest rates and semiannual payment calculations; [and] (ii) regularly received funds from and paid funds to the District's bank account . . . .").  And, with respect to the Remarketing Agreement, Citigroup carried out its duties as Remarketing Agent through both its New York and Washington offices.  (See, e.g., Toft Decl. ¶ 6 ("The remarketing of the Bonds . . . is coordinated by Citigroup's Short Term Finance Group, which is located in New York."); Herrling Supp. Decl. ¶ 6 ("Throughout the District's relationship with Citigroup, the District's primary contact with Citigroup was Mr. Jerry Bobo, who is located in Seattle, Washington.").)

At the center of AIG-FP's suit, however, are the District's alleged breaches of the Swap Agreement. Although some of the activities which allegedly constituted breaches of the Swap Agreement occurred in New York, the bulk of these activities took place in the State of Washington.  For example, AIG-FP alleges that the District breached the Swap Agreement through its implementation of

the Trust Plan.  (Compl. ¶¶ 12, 63-65.)  The Trust Plan was proposed, discussed and adopted at a meeting of the District's Board of Commissioners, held in Washington on September 18, 2008.  (See Compl. Ex. A.)

In addition, although the District's alleged improper pressuring of Citigroup to set higher interest rates consisted, in part, of a letter which included a New York addressee, the letter was sent from the District's office in Everett, Washington and it was also addressed to Citigroup's Seattle, Washington office.  (See Pickhardt Decl. Ex. J.)  According to an employee of the District, the letter was sent to Citigroup's New York office at the request of Mr. Bobo, the District's primary contact with Citigroup and the primary recipient of the letter, who is located in Washington.  (Herrling Supp. Decl. ¶¶ 6, 9.) Similarly, although the District refused AIG-FP's request to terminate the MBIA Bond Insurance Policy in a letter that included New York-based MBIA as an addressee, the decision to refuse and the letter communicating this decision originated from the District's office in Everett, Washington.  This letter also included additional addressees located outside of New York. (See Pickhardt Decl. Ex. M.)

The remaining District activities which are alleged to constitute breaches of the Swap Agreement consist of the District's "fail[ure] to cancel the repurchased 1995 Bonds" and "refus[al] to sell the 1995 Bonds other than in accordance with a proposed purchase agreement, which imposes . . . substantial restrictions on the liquidity . . . of the 1995 Bonds." (Compl. ¶ 67.)   The District persuasively points out that all of the District's alleged improper acts or omissions necessarily took place primarily in Washington, and not New York, because "Washington is the only jurisdiction in which the District is authorized to take action." (Def. Mem. at 12; see also Herrling Supp. Decl. ¶ 2 ("With regard to AIG-FP's claims about the District's failure to cancel the 1995 Bonds . . ., that also necessarily occurred in Washington, as such actions only can be undertaken by the District's elected Board. Washington is where the Board is constituted and Washington is the only jurisdiction in which the District takes action with regard to the bonds.").)   In light of the foregoing, the Court finds that Washington is the locus of operative facts.   Accordingly, this factor weighs heavily in favor of transfer to the Western District of Washington.

### f. *Availability of Process*

The availability of process to compel the attendance of witnesses is a neutral factor here because neither party has identified a witness who would be unwilling to testify without compulsion.  See Citigroup, 97 F. Supp. 2d at 562. Furthermore, even in the event there were witnesses who refused to testify without compulsion, "the unavailability of process over third-party witnesses does not compel transfer when the practical alternative of offering videotaped or deposition testimony of a given witness exists."  Id. at 561.

### g. *Relative Means of the Parties*

In determining whether the relative means of the parties weighs in favor of transfer, "a court should determine whether a party's 'financial situation would meaningfully impede its ability to litigate this case in either forum.'"  Truk Int'l Fund v. Wehlmann, No. 08 Civ. 8462, 2009 WL 1456650, at *7 (S.D.N.Y. May 20, 2009) (quoting In re Collins & Aikman Sec. Litig., 438 F. Supp. 2d 392, 397 (S.D.N.Y. 2006)).  According to a District employee, "If forced to litigate in New York, it would result in significant financial difficulties and hardships on the District."  (Herrling Supp. Decl. ¶ 13.)  AIG-FP

points out, however, that "the District has annual
operating revenues of over $640 million and over $1 billion
of investments."  (Pl. Mem. at 23 (citing Pickhardt Decl.
Ex. G at 27).)  Given that both parties are large business
entities, the Court is not persuaded that either party
lacks the financial resources to litigate this action in
either forum.  Accordingly, this factor is neutral.

### h. *Forum's Familiarity with the Governing Law*

   "The forum's familiarity with governing law is
typically given little weight by federal courts."  Sills v.
Ronald Reagan Presidential Found., No. 09 Civ. 1188, 2009
WL 1490852, at *11 (S.D.N.Y. May 27, 2009) (citing Astor
Holdings v. Roski, No. 01 Civ. 1905, 2002 WL 72936, at *13
(S.D.N.Y. Jan. 17, 2002)).  However, while "federal courts
in other states are capable of construing New York law,
especially in a straightforward contract question, the
forum's familiarity with the governing law may be a factor
even in contract cases."  LaFarge, 474 F. Supp. 2d at 486
(citations omitted).  Here, the agreement at the center of
the lawsuit, the Swap Agreement, has a New York choice-of-
law clause.  (See Herrling Decl. Ex. 1 at 56, § 10.7 ("This
agreement shall be construed in accordance with and
governed by the laws of the State of New York . . . ."

(emphasis omitted)).)  Also relevant, however, is that the
Remarketing Agreement contains a Washington choice-of-law
clause.  (See Pickhardt Decl. Ex. E at 17, § 14(h) ("This
Agreement shall be governed by and construed in accordance
with the laws of the State of Washington.").)  Since the
Swap Agreement, the primary agreement at issue in this
lawsuit, contains a New York choice-of-law clause, the
Court finds that the forum's familiarity with governing law
weighs against transfer, but only slightly.

### i. *Trial Efficiency and the Interest of Justice*

The District argues that the instant action should be
transferred to Washington to be consolidated with the
District's pending federal lawsuit against AIG-FP, which
involves the same parties, agreements, facts and
circumstances.  (Def. Mem. at 1, 22.)  AIG-FP does not
dispute the widely recognized principle that "'[t]ransfer
of an action to a district where a related case is pending
enables more efficient conduct of pretrial discovery, saves
witnesses time and money in both trial and pretrial
proceedings . . . thereby eliminating unnecessary expense
to the parties while at the same time serving the public
interest.'"  Foothill Capital Corp. v. Kidan, No. 03 Civ.
3976, 2004 WL 434412, at *4 (S.D.N.Y. Mar. 8, 2004)

(quoting <u>Levitt v. Md. Deposit Ins. Fund</u>, 643 F. Supp. 1485, 1493 (E.D.N.Y. 1986)) (second alteration in original); <u>see also Stroud Prods. & Enters. v. Castle Rock Entm't</u>, No. 07 Civ. 8638, 2009 WL 2391676, at *3 (S.D.N.Y. Aug. 4, 2009) ("[T]rial efficiency and the interests of justice weigh heavily in favor of litigating all related causes of action . . . in a single forum." (citation omitted)).  However, AIG-FP argues that "[a]s the first-filed action, this lawsuit is entitled to the presumption that it not be transferred in favor of a later-filed action."  (Pl. Mem. at 22 (footnote omitted).)  AIG-FP is correct that, generally, as noted above, where there are two competing lawsuits, the first suit should have priority.  <u>Employers Ins. of Wausau v. Fox Entm't Group</u>, 522 F.3d at 274-75.  However, "where suits are filed in quick succession and/or the court with the first filed action has done little with respect to it, the rule carries less weight."  <u>LaFarge</u>, 474 F. Supp. 2d at 489.  Here, the competing lawsuits were filed in relatively quick succession.[12]  Furthermore, this Court has not yet devoted significant judicial resources to this case.  Thus, despite AIG-FP's contention, when the totality of circumstances is

---

[12] AIG-FP filed the instant lawsuit against the District on July 2, 2009 (<u>see</u> Compl. at 1); less than one month later, on July 30, 2009, the District filed its lawsuit against AIG-FP in the Western District of Washington (<u>see</u> Tambe Decl. Ex. 2 at 1).

considered, trial efficiency and the interests of justice do not weigh in favor of maintaining this action in the present forum.

### j. *Balancing of the Factors*

After weighing these nine factors, the Court finds that the balance of convenience weighs in favor of transfer.  As noted above, the balance of convenience analysis in the context of applying the first-filed rule is substantially identical to the balance of convenience analysis in the context of ruling on a motion to transfer venue.  See,e.g., Everest, 178 F. Supp. at 465.  Thus, the Court finds that the balance of convenience supports both departure from the first-filed rule, and justifies transfer of venue.  The District has shown by clear and convincing evidence that transfer is warranted.[13]

---

[13] Because the Court finds that the balance of convenience weighs in favor of transferring this action to the Western District of Washington, the Court does not consider the District's argument that the "anticipatory filing" and "forum-shopping" exceptions to the first-filed rule are applicable.

  The Court further notes that the District initially moved this Court for a motion to transfer pursuant to 28 U.S.C. § 1406(a) (Def. Mem. at 1); however, since both parties' arguments addressed the motion as though it were brought pursuant to 28 U.S.C. § 1404(a), the Court has also done so.

### III. CONCLUSION

For the reasons set forth above, the District's motion to dismiss for lack of personal jurisdiction and improper venue is DENIED and the District's motion to transfer to the United States District Court for the Western District of Washington pursuant to 28 U.S.C. § 1404(a) is GRANTED. The clerk is directed to transfer this action to that district.

SO ORDERED.

Dated: December 14, 2009

Lawrence M. McKenna
U.S.D.J.